FILED
IN CLERK'S OFFICE
U.S. DISTRICT ~ D.N.Y.

★ FEB 2 3 2017 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
MADELINE & VINCENT
SANTORELLI,

          **Plaintiffs,**

- v. -

CROTHALL SERVICES
GROUP, INC. *et. al*,

          **Defendants.**

------------------------------------------------------x

<u>OPINION & ORDER</u>

15-cv-978 (NG) (RLM)

**GERSHON, United States District Judge:**

Plaintiff Madeline Santorelli ("Santorelli") brings this suit in diversity against Crothall Services Group, Inc., Crothall Facilities Management Inc., and Crothall Healthcare Inc. (collectively "Crothall") based on injuries she suffered as a result of a slip and fall that occurred while she was working as a nurse at Eger Health Care & Rehabilitation Center ("Eger"). Santorelli alleges that the fall was caused by the negligence of Eger employee Luis Ortega ("Ortega"), who was mopping the floors but neglected to place a cautionary wet floor sign in the area that he was mopping. Santorelli seeks to hold Crothall vicariously liable because it provided contract personnel to Eger who managed, trained, and supervised housekeeping personnel like Ortega. In addition to Madeline Santorelli's negligence claim, Vincent Santorelli brings a loss of consortium claim.

Defendants now move for summary judgment on two grounds. First, Santorelli's sole remedy is through worker's compensation, and her attempt to evade that limitation by arguing Ortega was Crothall's special employee is meritless. Second, under New York law, they did not owe a duty to Santorelli to keep the premises safe. As discussed below, I deny defendants' motion.

1

## I. Facts

### A. The Incident

This case concerns the August 15, 2012 slip and fall of Santorelli, a nurse at Eger, which is a healthcare facility located at 140 Meisner Avenue in Staten Island.[1] Shortly before her fall, Ortega—a building attendant—had mopped the floor and, according to Santorelli, failed to put up a cautionary sign. Plaintiff alleges that she slipped because of the wet floor and suffered injuries. These allegations are in dispute.[2] However, the heart of the pending motion does not lie in the facts surrounding the fall. Rather, it concerns the relationship between Eger and Crothall and how this relationship affects Ortega's employment status, which, in turn, affects Santorelli's ability to sue Crothall.

### B. Relationship Between Eger and Crothall

Eger employs its own staff members who clean the premises and maintain general upkeep. Though Eger employs the people who do the actual housekeeping tasks, on December 31, 2001, Eger entered into an agreement with Crothall whereby Crothall would provide managers to oversee Eger's cleaning staff. Service Agreement Between Eger and Crothall ("Agreement"). Pursuant to this Agreement, Crothall was to furnish "all management personnel required to accomplish [the] Services." Agreement at ¶ 2.a. The Services to be accomplished included "a high standard of housekeeping, plant operations and maintenance, and laundry management services." Agreement

---

[1] August 15, 2012—the date of the accident—was the last day Santorelli reported to work at Eger. Thereafter, she was on leave and received worker's compensation, but Eger ultimately terminated her employment in August of 2014 because of her inability to return to work. At the time of her termination she was fifty-two years old.

[2] At the time of his deposition in 2015, Ortega was still working at Eger and had been there for nine years. He disputes Santorelli's allegation that there was not a cautionary sign in front of the room where she slipped.

2

at ¶ 2.[3] On the date of the incident, Crothall employee Eric Tisdale ("Tisdale"), who worked out of an office at Eger, was Ortega's supervisor. The other Crothall employee assigned to Eger was Fred Rutledge, Tisdale's supervisor.

The Agreement is of critical, though not sole, importance in determining the relationship between Eger and Crothall because it outlines the responsibilities and costs both parties would assume. As to Eger, the following provisions detail its duties and the costs it would incur:

- "[Eger] shall hire, discharge, or discipline Supervised Employees upon [Crothall's] reasonable request if such actions are in accordance with [Eger's] policies and procedures." Agreement at ¶ 2.b.

- Eger pays "[a]ll wages and salaries including regular hourly pay, vacation pay, sick pay, bereavement pay and legal holiday pay for Supervised Employees." Agreement at ¶ 4.a.

- Eger pays "[t]he cost of social security taxes, state and federal unemployment insurance premiums, general liability and umbrella insurance premiums, worker's compensation premiums, medical, life and dental insurance premiums, and other fringe benefits and payroll based Federal, State or local taxes payable on behalf of Supervised Employees." Agreement at ¶ 4.b.

- Eger provides the "janitorial equipment owned by [Eger] . . . for use by [Crothall] plus the cost of purchasing on or before the commencement date of this Agreement the supplementary janitorial equipment." Agreement at ¶ 4.d.

- Eger also agrees to pay other ancillary costs necessary to perform the Services, such as the cost of electric power and utilities, paper towels, toilet paper, plastic liners for the disposal of medical waste, the cost of all waste removal, the cost of maintenance supplies (plumbing supplies, electrical supplies, hardware, filters and paint). Agreement at ¶ 4.e-1.

- Eger has the power to "request a change in the Services for reason of opening of new units or buildings or permanent closings of units or buildings or a change in housekeeping tasks or frequencies to be performed." Agreement at ¶ 5.f.ii.2.

As to Crothall, the following provisions describe its duties and the costs it would incur:

---

[3] This Agreement was in force on the date of the accident.

3

- "Furnish all management personnel required to accomplish [the] Services." Agreement at ¶ 2.a.

- "Train, manage and direct the Supervised Employees in the performance of the Services, in accordance with [Eger]'s policies and procedures." Agreement at ¶ 2.b.

- "Perform all administrative duties relating to the Supervised Employees." Agreement at ¶ 2.c.

- "Provide and maintain training equipment, films, slides, literature, daily work and project schedules, standard operational procedures and training manuals to be used in training Supervised Employees." Agreement at ¶ 2.d.

- "Furnish appropriate modules of [Crothall's] proprietary software, TeamCHIMES (the 'Software') for housekeeping, plant operations and maintenance, and laundry services." Agreement at ¶ 2.g.

- Pay "[a]ll wages and salaries including regular pay, vacation pay, sick pay, bereavement pay and legal holiday pay for [Crothall's] management staff working at [Eger]." Agreement at ¶ 3.a.

- Pay "[t]he cost of social security taxes, state and federal unemployment insurance premiums, general liability and umbrella insurance premiums, worker's compensation premiums, medical, life and dental insurance premiums, other fringe benefits, related administrative costs and payroll-based federal, state and local taxes payable on behalf of . . . [Crothall's] management, supervisory and clerical staff working at [Eger]." Agreement at ¶ 3.b.

- Pay for the "cost of all janitorial supplies and Minor Equipment used in performing the Services." Agreement at ¶ 3.c.

- Pay the "cost of manuals, forms, training aids, office supplies and long-distance telephone calls needed in performing the Services." Agreement at ¶ 3.e.

- Pay the "cost of starting [Crothall's] service at [Eger] as set forth [herein]." Agreement at ¶ 3.g.

- Pay the "cost of maintaining and repairing all janitorial equipment needed to perform the Services." Agreement at ¶ 3.h.

- In exchange for its services, Crothall would receive $441,198 annually. Agreement at ¶ 5.a.

In addition to the Agreement itself, which specifies the relationship between the parties in

principle, deposition testimony addressed how Eger and Crothall interacted in reality. Testimony revealed that Eger maintained the timecards of the housekeepers and that other Eger employees (such as nurses) would instruct housekeepers to perform certain tasks (such as cleaning rooms or taking out trash). Tisdale Dep. at 72; Hansen Dep. at 51-52.[4] These instructions were usually relayed from the nurses to Tisdale, but, on occasion, a nurse would directly tell a housekeeper to do something, and the housekeeper would oblige. Hansen Dep. at 26-28, 51-52.

Though Ortega identified Tisdale as his supervisor and acknowledged that Tisdale worked for a separate enterprise, he did not know Crothall by name. Ortega Dep. at 58. When commenting on the supervisory relationship between himself and building attendants, including Ortega, Tisdale stated that: (1) if he observed a building attendant mopping a floor without a cautionary sign, he had the authority to discipline that attendant and recommend his termination; (2) he held periodic safety meetings with the building attendants, which he referred to as "Crothall web-based training;" (3) if he observed water on the floor, he would order a building attendant to put a cautionary sign on the location and clean it up; (4) he maintained a duty list and schedule that showed daily assignments for housekeeping staff; and (5) he conducted inspections on a daily basis by walking around the premises. Tisdale Dep. at 24, 28-30, 34.

## II. Discussion

### A. Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate if the movant demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

---

[4] Linda Hansen was the supervising nurse on the date of the accident and signed the accident report.

"A dispute is not genuine unless the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Shiflett v. Scores Holding Co., Inc.*, 601 Fed. Appx. 28, 29 (2d Cir. 2015) (internal quotation omitted). A court is required to "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010). The moving party bears the burden of proof that no genuine issues of fact exist, but, once it satisfies this initial burden, the burden then shifts to the nonmoving party to present evidence that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323. "Summary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Rosenfeld v. Hostos Comty. Coll.*, 554 Fed. Appx. 72, 73 (2d Cir. 2014).

### B. Interpretation of New York Law

In the absence of a definitive ruling from the New York Court of Appeals, a federal court, when deciding issues of New York law, must "predict how the state's highest court would resolve" the issue presented. *Runner v. N.Y. Stock Exchange, Inc.*, 568 F.3d 383, 386 (2d Cir. 2009) (internal quotation omitted). In making this prediction, courts look to decisions of the Appellate Divisions as "helpful indicators of how the Court of Appeals would decide" the issue, but are "not strictly bound" by those decisions if there is "persuasive data" to suggest the Court of Appeals would decide the issue otherwise. *Reddington v. Staten Island Univ. Hosp.*, 511 F.3d 126, 133 (2d Cir. 2007).

### C. Is Ortega Crothall's Special Employee?

Ordinarily, when a person is injured by a co-worker, her exclusive remedy is to collect worker's compensation. *See Fung v. Japan Airlines Co., Ltd.*, 9 N.Y.3d 351, 357 (2007). Santorelli, an Eger employee, seeks to avoid the exclusiveness of this remedy by arguing that

Ortega, though technically an Eger employee, is not actually her co-worker because he is Crothall's special employee. Crothall disagrees and argues Ortega is not its special employee, thus making him plaintiff's co-worker and limiting plaintiff to worker's compensation.[5]

"A general employee of one employer may also be in the special employ of another, notwithstanding the general employer's responsibility for payment of wages and for maintaining workers' compensation and other employee benefits." *Thompson v. Grumman Aerospace Corp.*, 78 N.Y.2d 553, 557 (1991). "General employment is presumed to continue, but this presumption is overcome upon clear demonstration of surrender of control by the general employer and assumption of control by the special employer." *Id.* "[A] person's categorization as a special employee is usually a question of fact ... [however] we have held that the determination of special employment status may be made as a matter of law where the particular, undisputed critical facts compel that conclusion and present no triable issue of fact." *Id.*

In determining whether a special employment relationship exists, courts consider several factors. They include:

> [(1)] the right to and degree of control by the purported employer over the manner, details, and ultimate result of the special employee's work; [(2)] the method of payment; [(3)] the right to discharge; [(4)] the furnishing of equipment; and [(5)] the nature and purpose of the work.

*Gannon v. JWP Forest Elec. Corp.*, 275 A.D.2d 231, 232 (1st Dept. 2000). Of these factors, though not determinative, "who controls and directs the manner, details and ultimate result of the employee's work" is "significant and weighty." *Thompson*, 78 N.Y.2d at 558.

---

[5] Plaintiff concedes that "there is insufficient evidence of negligent supervision." Pl. Opp. at 1. Thus, there is no independent claim of negligence against Crothall—only a claim of vicarious liability based on Ortega's actions.

7

It is worth noting, at the outset, that the fact pattern in the instant case is not the classic one that often underlies the evaluation of whether a special employment relationship exists. More typically, Company 1 sends an employee to Company 2, and the issue is whether the employee is a special employee of Company 2. *See, e.g., Shoemaker v. Manpower, Inc.*, 223 A.D.2d 787 (3rd Dept. 1996). Here, Crothall sent an employee, Tisdale, to Eger to manage Eger's cleaning staff. If this were the typical situation, the question would be whether there were factual issues regarding a special employment relationship between Tisdale and Eger.[6] However, that is not the issue. Rather, the question is whether there is a factual issue regarding the employment relationship between Ortega, a housekeeper working at Eger under Tisdale's supervision, and Crothall.

The parties both rely on recent cases from the Second Department to argue for their respective positions. Defendants cite to *Spencer v. Crothall Healthcare, Inc.*, 38 A.D.3d 527 (2nd Dept. 2007), a case with facts similar to the instant case, including that Crothall was the defendant. In that case, plaintiff was a hospital employee who slipped on a wet floor while delivering food to a patient. As a result of the fall, plaintiff collected worker's compensation benefits from the hospital and then commenced a personal injury action against Crothall, which "managed" the hospital's housekeeping department. Crothall moved for summary judgment on the ground that plaintiff's exclusive remedy was worker's compensation. Plaintiff opposed and argued that the

---

[6] Defendants argue that "it is almost certain that . . . Eric Tisdale and Fred Rutledge would be deemed special employees of Eger . . . When viewed in this light, the suggestion that Ortega was somehow a general employee of Eger and, at the same time, a special employee of a special employee of Eger is absurd." Def. Reply at 4 n.1. This argument is based on an incorrect assumption. It is not "almost certain" that Tisdale would be deemed Eger's special employee. On the contrary, "independent contractors and their employees are routinely instructed as to what they should do by those purchasing their services, but do not therefore become the purchasers' employees." *Bellamy v. Columbia Univ.*, 50 A.D.3d 160, 164 (1st Dept. 2008).

8

housekeepers were Crothall's special employees, thus allowing her to sue Crothall. In granting summary judgment to Crothall, the Second Department concluded:

> Here, the hospital did not surrender control of the employees as it paid their wages, provided them with workers' compensation insurance, and made the final decision to hire, discipline, or fire them. Since the members of the housekeeping staff are general employees of the hospital, the plaintiff is precluded by the exclusivity provision of the Workers' Compensation Law from bringing this action against [Crothall].

Crothall argues that *Spencer* is dispositive given its indistinguishable facts. Plaintiff counters by arguing that the only "feature of control cited by the Court in *Spencer* appears to have been that Crothall Healthcare Services, Inc. 'managed' the housekeeping staff at the hospital, [while] the evidence in the case at bar demonstrates a far greater level of control than mere management . . . the terms of the contract . . . require Crothall to 'Train, manage and direct the Supervised Employees in the performance of the Services.'" Pl. Opp. at 8. Though the opinion in *Spencer* refers only to Crothall managing the housekeepers, the brief plaintiff submitted to the Appellate Division reveals that the contract in *Spencer* also required Crothall to "train, manage and direct all Supervised Employees." Brief of Plaintiff, *Spencer v. Crothall*, 38 A.D.3d 527 (2nd Dept. 2007). That is the exact language used in the contract between Crothall and Eger in this case. *See* Agreement at ¶ 2.b. Accordingly, plaintiff's attempt to distinguish *Spencer* on this ground is unavailing.

But, while *Spencer* is indeed analogous to this case, so too is the case on which plaintiff relies, *Lotz v. Aramark Servs., Inc.*, 98 A.D.3d 602 (2nd Dept. 2012).[7] In *Lotz*, plaintiff was a hospital employee who slipped and fell on a wet floor. She then sued Aramark, which contracted with the hospital to provide cleaning services. Plaintiff alleged that the wet floor was created by

---

[7] I note that there was no overlap among the judges who comprised the Second Department panels that heard the *Spencer* and *Lotz* cases.

members of the housekeeping staff who were the defendant's special employees. The court denied defendant's summary judgment motion because "plaintiff raised a triable issue of fact . . . as to whether these members of the housekeeping staff were the defendant's special employees." *Id.* at 603. An examination of the briefs presented to the Second Department reveals the following facts: Like Crothall, Aramark did not hire the housekeeping staff that caused the alleged dangerous condition. Moreover, Aramark did not even have any management personnel on duty when the accident occurred. Similar to Crothall in the instant case, Aramark relied on its contract with the hospital, which required it to develop and implement a housekeeping program that would comply with the hospital's standards, thus evidencing Aramark's lack of ultimate control over the housekeeping staff's work. The Second Department rejected Aramark's arguments and determined that there was an issue of act as to whether the housekeepers were its special employees.

Given that these two Second Department decisions have facts analogous to the current case, but point in opposite directions, neither is particularly instructive as to how the New York Court of Appeals would decide this issue. Therefore, I will return to the seminal New York Court of Appeals case in the special employment context for guidance, *Thompson v. Grumman Aerospace Corp.*, 78 N.Y.2d 553, 557 (1991). Both parties rely on *Thompson* and it was cited approvingly in both *Lotz* and *Spencer*.[8]

---

[8] I note that the issue of determining whether an employee of one company has become a special employee of another predates not only *Thompson*, but also the New York worker's compensation law, which was enacted in 1913. *See* 1913 N.Y. Laws, Chap. 816, as amended by 1914 N.Y. Laws, Chap. 41. In *Standard Oil Co. v. Anderson*, 212 U.S. 215 (1909), plaintiff was a longshoreman who was injured while loading a ship. At the time of the accident, plaintiff's employer—a master stevedore—was under contract with defendant to load a ship with oil. The Supreme Court had to decide who plaintiff's employer was when he was injured—the stevedore or the person with whom the stevedore had contracted. In analyzing the facts, the court noted that

In *Thompson*, plaintiff was a general employee of Applied Transportation Service ("ATS"), which provided plaintiff's paycheck and carried his worker's compensation insurance. ATS's role was to recruit and provide trained, experienced candidates for employment at Grumman that met job descriptions and specifications Grumman furnished in advance. ATS submitted resumes to Grumman, and Grumman interviewed and selected the candidates. Once employed, only Grumman could terminate plaintiff's employment. After Grumman hired him, plaintiff worked exclusively for Grumman at its facility, and he reported daily to a Grumman supervisor who assigned, supervised, and monitored his daily work activities.

On these facts, at the summary judgment stage, the Court of Appeals concluded that plaintiff was Grumman's special employee. It emphasized that, other than paying plaintiff's paycheck and employee benefits, all other essential aspects of an employment relationship were between plaintiff and Grumman. All work was done at Grumman's premises, pursuant to Grumman's direction, and in furtherance of Grumman's business, not ATS's business. Accordingly, plaintiff was a special employee of Grumman and could not sue Grumman for a work-related injury, but rather was limited to the worker's compensation remedy.

There are certain particularly instructive portions of the *Thompson* opinion. First, the court noted that the issue of special employment is usually one of fact. Second, despite ATS paying plaintiff's salary and providing employment benefits (including workers' compensation), the court did not find it to be plaintiff's employer. Most importantly, the essence of *Thompson's* analysis was its focus on who was responsible for the employee at issue. In finding Grumman to be plaintiff's employer, the court emphasized that plaintiff reported to a Grumman supervisor and

---

determining the true employer "is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work." *Id.* at 222.

worked at Grumman's facility pursuant to Grumman directives in furtherance of Grumman's business interests.

Turning to the special employment factors in this case, only one points unequivocally in Crothall's favor. Nobody disputes that Eger pays Ortega and is responsible for his employee benefits. As to the others, none of them points squarely in Crothall's favor. To be sure, some are more favorable to Crothall than others. For example, regarding the furnishing of equipment, it is true that Eger was primarily tasked with that duty. The Agreement requires Eger to provide the janitorial equipment it owned to Crothall and to purchase additional equipment (in the amount of $58,870) prior to Crothall providing its services. Crothall was responsible only for purchasing janitorial supplies and minor equipment.

As to the ability to hire and fire Eger employees, it is undisputed that Crothall did not have the power to unilaterally fire Eger employees. However, Tisdale's deposition testimony revealed that he could recommend discipline or termination, and the Agreement required Eger to comply with that request if reasonable. *See* Tisdale Dep. at 86. How this hiring/firing authority actually worked in practice is not entirely clear from the current state of the record and is the type of factual issue properly decided by a jury. Similarly, the nature and purpose of the work is more mixed in this case than the typical one. For example, where a temporary employment agency assigns its employee to a factory, the employee is quite clearly working in furtherance of the factory's business interests. In this case, in contrast, Ortega is keeping the hospital clean and safe, which is certainly in the hospital's interest and furthers its goals. At the same time, however, the very nature of Crothall's business is to manage these hospital workers—that is its livelihood. Ortega's efforts further that livelihood because, without housekeepers like Ortega, there would be no reason for Eger to hire Crothall in the first instance.

12

As to the most critical factor under *Thompson*—who controls and directs the manner, details, and ultimate result of the employee's work—it is the most disputed. Plaintiff relies on the following facts to support her argument that Crothall directed Ortega's work: (1) no Eger employee managed Ortega; rather he was responsible only to Crothall employees; (2) the Agreement bound Crothall to "[t]rain, manage and direct the Supervised Employees in the performance of the Services;" (3) Crothall could recommend that staff be fired and could discipline them; (4) Crothall maintained the duty list; and (5) Crothall held safety meetings for the housekeeping staff.

In response, Crothall does not dispute that it managed the cleaning staff, nor could it given that was the Agreement's express purpose. However, it argues that it did not control the "ultimate result" of Ortega's work because Eger was the entity that set the standards for cleanliness at its facility. Pursuant to the Agreement, Crothall was to "train, manage and direct the Supervised Employees in the performance of the Services, *in accordance with* [Eger's] policies and procedures." Agreement at ¶ 2.b (emphasis added). This argument has some support. For example, attached to the Agreement are schedules, the first of which, Schedule I, is entitled, "Housekeeping Service Specifications." This is a 17 page document in which Eger outlines the frequency with which Crothall is to perform certain cleaning tasks, such as dusting, sweeping, mopping, and vacuuming.

It may be the case that Eger so greatly restricted Crothall's discretion in managing Ortega that Crothall was simply serving as a conduit for Eger and that it is actually Eger who directed Ortega and was ultimately responsible for his work. On the other hand, on a day-to-day basis it was Crothall who was managing the housekeeping staff, training them, giving them their assignments, and inspecting their work. That is why Eger hired Crothall. These factual disputes

13

make it impossible to say, as a matter of law, that Crothall was not tasked with controlling and directing Ortega.[9]

In sum, the only factor that unequivocally supports Crothall's argument is that it did not pay Ortega's salary or provide his employment benefits. As to the other four, there are facts and inferences that can be drawn that can support either party. That is why special employment is "usually a question of fact" reserved for a jury. Accordingly, I deny defendants' motion for summary judgment because factual issues remain regarding whether Ortega was Crothall's special employee.[10]

### D. Did Crothall Owe a Duty to Santorelli?

Before a defendant can be held liable in a negligence action, there is the threshold issue of whether defendant owed plaintiff a duty of care. Crothall independently argues that it is entitled to summary judgment because it owed no such duty to Santorelli.

When and whether a person owes a duty of care to another is an issue that has continually evolved in New York's common law. In assessing whether a duty exists in this case, the parties

---

[9] Crothall makes the further argument that finding Ortega to be its special employee would subject it to liability for things outside of its control. For example, if it does not have the ultimate power to discharge a hypothetical member of the housekeeping staff who is completely inept and creating dangerous conditions, then neither "public policy nor logic" supports holding Crothall liable. Def. Reply at 4. Similarly, if it has to abide by Eger's policies and procedures, it is possible that those policies could force Crothall to act in a certain way that exposes it to greater liability than if it was free to act on its own. However, assuming Crothall is not already contractually protected from these outcomes, surely Crothall could have protected itself from these outcomes through contract. Its failure to do so does not change the law and how that law applies to the facts of this case.

[10] I also reject Crothall's argument in its reply brief that Santorelli cannot sue Crothall even if Ortega is its special employee because she is nonetheless Ortega's co-worker and therefore is limited to worker's compensation. This argument is meritless. Santorelli is limited to worker's compensation from Eger, but if Crothall is found to be Ortega's special employer under the principles of *Thompson*, then she can sue Crothall.

14

focus on the doctrine articulated in *Espinal v. Melville Snow Contrs.*, 98 N.Y.2d 136 (2002). In that case, the court integrated threads of New York common law to elucidate when a failure to perform a contractual obligation can give rise to a negligence action by a third party with whom the defendant was not in privity. *Espinal* undoubtedly is highly relevant to this case and informs whether Crothall owed Santorelli a duty of care. I do note, though, that there is another issue that the parties fail to address. Namely, "a person is not necessarily insulated from liability in tort merely because he or she is engaged in performing a contractual obligation." *Landon v. Kroll Lab. Specialist, Inc.*, 91 A.D.3d 79, 83 (2nd Dept. 2011). Instead, "[t]he very nature of a contractual obligation, and the public interest in seeing it performed with reasonable care, may give rise to a duty of reasonable care in performance of the contract obligations, and the breach of that independent duty will give rise to a tort claim." *Id.* However, given the parties' focus on *Espinal* and the fact that my conclusion does not require me to reach the issue of whether a more general duty exists, I will confine my analysis to the applicability of the *Espinal* exceptions.

In *Espinal*, the court had to determine whether a "duty ran from [defendant] to plaintiff, given that [defendant's] snow removal contract was with the property owner." *Espinal*, 98 N.Y.2d at 138. The court noted that "[u]nder our decisional law a contractual obligation, standing alone, will generally not give rise to tort liability in favor of a third party." *Id.* However, it also noted that, as the common law evolved, courts had recognized certain exceptions to this general principle. Focusing on three specific cases from New York's common law history, it articulated the three circumstances under which there is a duty to a third party that arises from a contracting party's failure to properly perform a contractual duty. These three circumstances are: "(1) where the contracting party, in failing to exercise reasonable care in the performance of his duties, launches a force or instrument of harm; (2) where the plaintiff detrimentally relies on the continued

15

performance of the contracting party's duties; and (3) where the contracting party has entirely displaced the other party's duty to maintain the premises safely." *Id.* at 140 (internal quotations and citations omitted).

Defendants argue that none of these three exceptions apply, and therefore they did not owe a duty to plaintiff. Plaintiff argues that there are issues of fact as to whether Crothall owed a duty to Santorelli pursuant to the first and third exceptions (launching an instrument of harm and total displacement to maintain a premises safely).[11]

### 1. Launching an Instrument of Harm

Defendants' argument that they owe no duty to plaintiff under this exception is unpersuasive because it exclusively relies on their position that "Ortega remained Eger's employee and was acting for Eger's benefit, cleaning Eger's floors. Moreover, Crothall cannot be derivatively liable for Ortega's actions because the law does not allow that sort of end-run around workers' compensation exclusivity." *Id.* This conflates the duty issue with the special employment issue, but the two are distinct. If Ortega is found to be Crothall's special employee, then there is the further issue of whether Crothall owed a duty only to Eger or to a non-contracting third party like Santorelli. Crothall fails to offer any argument as to this latter issue. Plaintiff alleges that she slipped and fell on a wet floor that Ortega had recently mopped, but that had not been designated as wet with a cautionary sign. Under plaintiff's evidence, Ortega launched an instrument of harm by creating the wet floor and not putting up a cautionary sign; and Crothall would be vicariously liable for this action if Ortega is found to be its special employee.

---

[11] In her opposition, plaintiff explicitly disavows reliance on the second exception. *See* Pl. Opp. at 9.

Accordingly, there is an issue of fact as to whether Crothall owed a duty of care to Santorelli pursuant to this exception.

## 2. Total Displacement of Eger's Duty to Safely Maintain the Premises

For many of the same reasons discussed above regarding the special employment issue, there is also an issue of fact regarding whether Crothall entirely displaced Eger's duty to maintain the premises safely.[12] In answering whether one entity has entirely displaced another in the responsibility to safely maintain a premise, courts have looked to the services agreement to determine whether it is sufficiently comprehensive to warrant such a conclusion.

For example, in *Karac v. City of Elmira*, 14 A.D.3d 842 (3rd Dept. 2005), the defendant contracted with the City of Elmira to maintain and operate a parking garage that the city owned. The contract required the defendant to provide insurance on the garage and to hire all of the employees that worked in the garage, including a supervisor who was responsible for the day-to-day operation and training of employees. *Id.* at 844. These day-to-day operations included coordinating and supervising staff, accounting for revenues, and being responsible for the physical, mechanical and electrical maintenance of the premises. *Id.* Overturning a grant of summary judgment to the contractor, the Appellate Division concluded that the "contract [was] so

---

[12] This *Espinal* exception derives from *Palka v. Servicemaster Mgmt. Servs. Corp.*, 83 N.Y.2d 579 (1994). In that case, defendant had contracted with a hospital "to provide management services, which included, in part, the duty to 'train, manage and direct' all support service employees of the hospital, expressly including the hospital's maintenance department." *Id.* at 582. Plaintiff, a nurse at the hospital, was injured when an oscillating, wall-mounted fan fell and hit her. The trial court denied defendant's motion for a directed verdict and the jury found in plaintiff's favor. The Appellate Division reversed and granted defendant's motion. The New York Court of Appeals reversed the Appellate Division and reinstated the jury verdict because it concluded that "when a party contracts to inspect and repair and possesses the exclusive management and control of real or personal property which results in negligent infliction of injury, its assumed duty extends to noncontracting individuals reasonably within the zone and contemplation of the intended safety services." *Id.* at 590.

comprehensive and exclusive that it completely displace[d] the other contracting party's duty toward the third party." *Id.*

Similarly in *Tushaj v. Elm Mgmt. Assoc.*, 293 A.D.2d 44 (1st Dept. 2002), the Appellate Division reinstated a jury verdict for plaintiff where defendant was hired by a building owner to manage the day-to-day operations of the building, including making periodic inspections and ensuring that the building was in good repair. Though defendant had to receive permission from the building owner before making repairs if the cost exceeded $500, it had full authority to effectuate repairs costing less than $500. The court concluded that the jury properly found that defendant owed plaintiff a duty because plaintiff was harmed by a faulty condition in the building, the repair of which would have cost only twelve dollars. The court stated, "plaintiff . . . was among those limited individuals whose safety came within the scope of defendant's contractual obligations, and the risk of his being injured as a result of defendant's failure to fulfill those obligations was assuredly foreseeable." *Id.* at 48.

Again, in *Suarez v. JPMorgan Chase Bank*, 128 A.D.3d 500 (1st Dept. 2015), the Appellate Division concluded there was an issue of fact regarding the duty owed. In that case, defendant contracted with the landowner to remove snow from the parking lot. The court noted that the snow removal contract used broad language that suggested defendant had entirely absorbed the landowner's duty, but it stated, "there is evidence . . . . that [the landowner] retained control over the snow removal services by directing [defendant] to stop using sand on the icy parking lot and to remove piles of snow from the premises." *Id.* at 500.

As in *Suarez*, there is evidence that the services Crothall provided were, to an extent, subject to Eger's control. For example, similar to the landowner in *Suarez* directing defendant as to the methods it used to remove the snow, Eger dictated how and when certain cleaning tasks

18

were to be done. But, as in *Karac*, Crothall was responsible for the day-to-day operation of the housekeepers who cleaned Eger's facilities. And, when considering *Tushaj's* language, Santorelli "was among those limited individuals whose safety came within the scope of defendant's contractual obligations," and injury to her from Crothall's "failure to fulfill those obligations was assuredly foreseeable." *Tushaj*, 293 A.D.2d at 48.

Accordingly, I deny defendants' motion for summary judgment on the ground that it did not owe plaintiff a duty because there is an issue of fact as to whether it entirely displaced Eger's duty, as defined by New York law, to maintain the premises safely.

### III. Conclusion

Factual issues remain as to the two grounds on which defendants seek summary judgment—(1) whether Ortega was Crothall's special employee; and (2) whether Crothall owed Santorelli a duty of care. Therefore, defendants' motion for summary judgment is denied in its entirety.[13] The parties are directed to submit a proposed joint pretrial order in accordance with my Individual Practices by March 24, 2017.

**SO ORDERED.**

/s/ Nina Gershon

**NINA GERSHON**
**United States District Judge**

Dated: February 23, 2017
  Brooklyn, New York

---

[13] Defendants do not argue that Vincent Santorelli's loss of consortium claim should be dismissed for any reason other than that it is derivative of his wife's claim.